TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00572-CR


NO. 03-97-00574-CR







Jason Ray McMahon, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF HARRIS COUNTY, 174TH JUDICIAL DISTRICT


NOS. 687337 & 9429514, HONORABLE SAM ROBERTSON, JUDGE PRESIDING






 Appellant Jason Ray McMahon appeals his convictions for two separate incidents of
aggravated kidnaping, separately indicted. Both involved the same victim and occurred on or about
December 15 and 19, 1994, in Harris County. See Tex. Penal Code Ann. § 20.04(a)(5) (West Supp.
1998). (1) In a joint trial with five co-defendants, a jury convicted appellant of both offenses and assessed
his punishment at life imprisonment and a fine of $10,000 in each case. Appellant brings twelve points of
error. We will affirm the convictions. 


Background


 Appellant's convictions grew out of events that took place during six days in December
1994 in Harris County. A number of other people were involved in the events. Some witnesses were
accomplices. In December 1994 appellant was the leader of a group of young adults who lived in the
Montrose area of Houston. Appellant bragged of being the leader of a gangster-type family and talked of
controlling a territory around lower Westheimer. One activity in which the group was involved was selling
protection to "drag queens" living and working in the area. Another was distribution of cocaine. Co-defendant Darrold Alexander was appellant's right-hand man. Alexander and appellant were selling
protection to a young man, Rudy Meinecke.

 Appellant became upset with Meinecke and directed Alexander to bring Meinecke to
Alexander's apartment. The reason for appellant's anger was that Meinecke had allegedly turned him in
to the police and appellant claimed that as a result he lost a Mercedes-Benz, $50,000 and other property. 
On December 15, 1994, Alexander sent several of his roommates, including Jonathan Harrell, who testified
as an accomplice, to find Meinecke and bring him to the apartment. Five people returned with Meinecke. 
Alexander ordered Meinecke to strip off his clothes, made him lie face-down on a weight bench, and
ordered Jonathan Harrell to tie him to the bench. During the entire event Meinecke was crying and
repeatedly said he did not want to die. Alexander hit Meinecke on the legs with a bar several times. This
was a closet bar made of a thick wooden dowel about two feet long. Alexander hit Meinecke with the club
several times on the back of his legs at the knees and kept asking him why he had turned appellant in to
the police. After beating Meinecke for a while, Alexander ordered Harrell to call appellant on the phone;
appellant then came to the apartment. Appellant directed that Meinecke be untied and placed in a chair. 
Appellant put a knife to Meinecke's throat and asked why he had turned him in to the police. Appellant
hit Meinecke in the face with his fists several times. Appellant poured lighter fluid over Meinecke's body
as Meinecke cried, "Please don't burn me." He had no clothes on, was crying and scared. Appellant told
Meinecke that he owed appellant a lot of money and in order to pay it back he had to prostitute himself. 
Appellant demanded $100 by 10:00 p.m. and threatened to hurt Meinecke's girlfriend if he did not pay
within the time ordered by appellant. Meinecke was allowed to dress and left the apartment with some of
his captors, who took him to a telephone to make dates to sell sexual services. 

 J. D. Torres, a patrol officer with the Houston Police Department, testified that he
encountered Meinecke on December 15, 1994, at about 5:30 p.m. in the Montrose area. Meinecke was
limping and had bruises on his arms and legs. He declined Torres's offer to call an ambulance and said he
would see his own physician. 

 Pedro Jimenez, a friend of appellant's, testified that on the next day, December 16,
appellant told him that he had gone to Alexander's place where Meinecke was tied up, and that he beat
him and let him go afterwards. Jimenez also testified that later that evening Hesper Castro came to
Charlie's, a restaurant frequented by appellant and his associates, to report to appellant that she had seen
Meinecke talking to the police. Appellant was not there so she called him at home. Later that night
Jimenez went to appellant's house; appellant was very angry at Meinecke. Appellant told Jimenez that he
was going to have Alexander find Meinecke and hold him for appellant. 

 Jimenez testified that on December 19, Jeremiah Sandoval and Jarriatt Bohle came to
Charlie's and talked to him. They told him that they planned to make charms out of Meinecke's body
parts, such as his ears. At trial, in response to the question of whether he had any further conversation with
any of those individuals that day, the nineteenth, Jimenez testified: "I called Jason [appellant] and he said
that they had Rudy [Meinecke] tied up and that they were beating him."

 It is not clear exactly what happened between the first kidnaping on the 15th and the next,
which occurred the 19th and 20th of December, and probably began earlier. Meinecke was conditionally
released to make money for appellant by prostituting himself. At some point on or after December 16,
Meinecke was taken back to the apartment and was initially assaulted by co-defendants Bohle and
Sandoval and possibly others. Jonathan Harrell testified that Bohle told him that he had bitten Meinecke's
nose and that Sandoval told him he had kicked Meinecke in the head because Meinecke had lied to
appellant about having given money due appellant to Bohle and Sandoval. This got them in trouble with
appellant, who had assaulted them and threatened them with a knife. Bohle claimed that appellant had
bitten his nose, and that was the reason Bohle bit Meinecke's nose. 

 Annette Thomas, an Emergency Medical Technician with the Houston Fire Department,
testified that she responded to a call to the 600 block of Westheimer at 7:53 p.m. on December 19th. She
found a group of teenagers waiting with Rudy Meinecke, who had been the victim of an assault. After
Meinecke was in the ambulance, co-defendant Lisa Badger got into the cab of the ambulance and said that
she would accompany him to the hospital. During the ride to Ben Taub Hospital, however, Meinecke
informed the EMT that he was trying to get away from the people in that group. Ms. Thomas noticed that
Meinecke's face was very red. He had a laceration on his neck and bruises to his body. He had also
sustained two bites to the backs of his calves. Thomas delivered Meinecke to an examination room. Lisa
Badger wanted to go with him, but the hospital personnel would not allow her in the room. Jonathan
Harrell testified that Alexander sent him and one of Harrell's brothers to the hospital to see about bringing
Meinecke back, but when they got there he had already been discharged. Lisa Badger brought Meinecke
back to the apartment late that evening.

 After Lisa Badger returned the victim to Alexander's apartment, the beating and torture
intensified. Among those present and participating in the torture were the individuals convicted in the joint
trial with appellant: Darrold Alexander, Lisa Badger, Jeremiah Sandoval, Jarriatt Bohle, and Timothy
Lathrop. Alexander smashed Meinecke's head into the wall and knocked a hole in the wall. Alexander
used a metal exercise bar to beat the victim on the head and body. He used a "sleeper hold" to squeeze
Meinecke's neck until the victim lost consciousness and when he let his body drop, Meinecke's head hit
on the corner of the weight bench. Jonathan Harrell saw Timothy Lathrop kick Meinecke in the head and
face three times with heavy boots. He kicked him so hard his body went across the room and blood
splattered on the walls. One witness, Cheryl Branch, saw Meinecke lying in the middle of the floor naked
and burned. His face was bloody and swollen, his nose was dangling by a piece of skin and he had no hair
on his head. His genital area was severely burned. Alexander was hitting the victim with a metal bar while
he, Lisa Badger, Timothy Lathrop, Jarriatt Bohle, Jeremiah Sandoval and another man kicked Meinecke
in the head, ribs, genital area, legs and arms. Bohle, Sandoval, and the other man had on heavy boots. 
The torture would go for a while, then Meinecke would be dragged over to a small closet, referred to as
"the hole," and stuffed into it. A heavy bookcase was moved to block escape from the closet. After a
period of time he would be brought out and the beating and other torture would resume. During the time
Meinecke was being held and tortured, the participants shouted at him a lot about why had he "snitched
off" appellant and Alexander. 

 Jonathan Harrell saw Alexander pour lighter fluid on Meinecke's body and set him on fire. 
Alexander and another person directed hair spray through the flame of a cigarette lighter and made a flame
thrower to burn the victim's body. Other flammable liquids, including fingernail polish remover and hair
remover, were poured onto Meinecke and lighted. 

 At one point, Alexander took the wooden dowel and inserted it into Meinecke's rectum. 
Then Alexander had someone heat up an electric curling iron and with Timothy Lathrop, Jarriatt Bohle and
another man holding Meinecke, Alexander inserted the hot curling iron into his rectum. Cheryl Branch was
not in the same room and did not see the iron being applied, but she saw the iron plugged in and heating
up, she heard the victim screaming and begging Alexander not to stick the curling iron into his rectum, and
she could smell the burning flesh and hear the sizzling each of the three times it was inserted. Those present
in the room while this was being done to Meinecke included Jeremiah Sandoval, Jarriatt Bohle, Lisa
Badger, Timothy Lathrop, Darrold Alexander, and at least two others. 

 Meinecke was put back in the closet and later brought out and seated in a chair. Cheryl
Branch saw Alexander, Jeremiah Sandoval, Lisa Badger, Timothy Lathrop, Jarriatt Bohle and another man
around the chair. Alexander poured lighter fluid on Meinecke's genital area and lit it with a cigarette lighter. 
Sandoval and Bohle and another man poured water on Meinecke's head. Then they poured bleach over
his head, chest and genital area while Meinecke screamed.

 Meinecke was "flopping like a fish, like he was having seizures," and passing in and out of
consciousness. Alexander directed Lisa Badger to call appellant for transportation and to tell him that
Alexander did not know what to do with Meinecke. Jonathan Harrell and Joseph Hurd, another
accomplice witness who testified at the punishment phase, put a shirt and sweat pants on the victim. He
screamed with pain. Then Alexander, Lisa Badger, Jeremiah Sandoval, Jarriatt Bohle, Timothy Lathrop,
Joseph Hurd and three other men left the apartment carrying Meinecke. The plan at that time was to take
Meinecke to a waterfall near the Galleria, inject him with lighter fluid and throw his body in the water. The
group returned without Meinecke and reported that they had an encounter with the police and had lied to
them about getting a phone call to come get their friend who had gotten drunk and passed out on the side
of the road. The police had called an ambulance to take Meinecke for medical care. 

 Deputy Constable John Karrer testified that he saw a group of people at 3:00 a.m. on the
morning of December 21 and stopped to talk to them. Lisa Badger told him that they were helping a friend
who had gotten drunk and passed out on the side of the road. The deputy asked to see the friend, and was
pointed to a pile of jackets on the side of the road. He looked into the pile for a person and discovered
Meinecke's bruised and lacerated face. The deputy called for an ambulance. He uncovered the rest of
the victim's body and found large burns around the groin. He then called for assistance from the Houston
Police Department. When the deputy asked Lisa Badger about the injuries, she acted surprised. The
others suggested that it was a case of gay bashing. Members of the group told the authorities conflicting
and changing stories. 

 Meinecke underwent exploratory surgery and was found to have a bruised left kidney and
pancreas. A doctor testified as to his examination of other injuries to the victim. Meinecke was disoriented
and confused, his eyes were swollen shut and his lips were swollen. He had multiple cuts and bruises on
his face. His nose had an unusual curved laceration that penetrated the entire thickness of the nose. The
injury could have been caused by a human bite. He had two black eyes, indicating a baseline skull fracture. 
A CAT scan revealed air in the brain space and multiple fractures of most of the bones in the face and skull. 
He had second and third degree burns on his chest, neck, lower abdomen, legs, buttocks, and groin. These
were thermic chemical burns and could have been caused by lighting a flammable liquid. A rectal
examination revealed second and third degree burns along the rectum and the anal canal. Because this skin
is so sensitive, the burns were excruciatingly painful. The examining doctor determined that Meinecke
would have died within a few days if he had not received medical treatment. Meinecke began receiving
psychiatric treatment early in 1995. He was diagnosed with post-traumatic stress disorder, and was
severely impaired in his ability to function in everyday life. He did not testify at the trial.


Change of Venue

 Appellant's first point of error contends that the trial court erred by refusing to hold a
hearing on his motion for change of venue. The relevant statute provides:


(a) A change of venue may be granted in any felony or misdemeanor case punishable by
confinement on the written motion of the defendant, supported by his own affidavit and
the affidavit of at least two credible persons, residents of the county where the prosecution
is instituted . . . .


Tex. Code Crim. Proc. Ann. art. 31.03(a) (West 1989) (emphasis added).

 Appellant did not file a written motion for change of venue nor any supporting affidavits. 
He argues that the trial court permitted him to adopt the motion of a co-defendant in the case. Three co-defendants filed hastily drafted handwritten motions for change of venue after the court had completed its
remarks to the venire panel. The trial court did permit counsel for co-defendants to adopt or join motions
and objections of the others in many instances throughout the trial in order to expedite this complex
proceeding with six co-defendants. However, we do not believe that the trial court allowed any of the co-defendants to orally adopt a motion for change of venue, which is required to be in writing and supported
with affidavits. No request was made to the court that these statutory requirements be waived, and we
need not consider whether a trial court can waive them. During the voir dire proceedings, in response to
general requests for a procedure to adopt the motions of other co-defendants, the court responded
affirmatively, but then said the matter would be taken up "after we get a jury." After the jury was selected,
the general question was posed again whether an objection made by the attorney for one defendant could
be considered an objection on behalf of each one. The trial court responded that it would certainly be
appropriate but that he could think of some motions where that would not apply. Then, significantly, he
reviewed the status of the filed written motions for change of venue and expressed concern about the form
of the affidavits in support of two of the written motions. The trial court wanted to insure that the signatures
were not copies but originals. We believe that this demonstrates that there was no waiver for any defendant
of the statutory requirements for a motion for change of venue to be written and accompanied by supporting
affidavits. 

 Even assuming that appellant was granted permission to orally adopt a motion for change
of venue of an unspecified co-defendant, he did not submit his own affidavit in support of that motion. A
motion not sworn to in accordance with the article quoted above is insufficient and nothing is presented for
review. Donald v. State, 453 S.W.2d 825, 827 (Tex. Crim. App. 1970). See Cover v. State, 913
S.W.2d 611, 613 (Tex. App.--Tyler 1995, pet. ref'd). Appellant's first point of error is overruled. 


Voir Dire

 Appellant complains of restrictions on the voir dire examination in points of error two
through six. There were six defendants in the trial and there were 361 members of the large venire panel. 
The trial court allotted two hours to the six defense counsel for voir dire examination of the panel. The
defense divided the time among themselves. During voir dire, the trial court adopted a procedure by which
an objection by one defense counsel was considered as having been made on behalf of all defendants. We
will follow that procedure and our references to objections made by appellant include objections by any
of the defense counsel. 

 Appellant's second and third points of error complain that the trial court erred when it
precluded him from asking questions about whether the panelists' ability to make a fair decision would be
affected by evidence that the defendants practiced a different religion such as satanism or vampirism. 
During voir dire, appellant's attorney stated that there might be some evidence in the case about vampires
or satanism, that some people might have such strong feelings about such practices that it could affect their
judgment on guilt, but that the constitution allows persons to practice their own religion in whatever way
they choose. The prosecutor objected and characterized these remarks as a misstatement because people
are not permitted to practice religion in a way that hurts another person. The prosecution also objected
to the defense going too far into the facts of the case. The trial court sustained the objection, saying that
the defense had gone too far into what may be the facts. Appellant's counsel rephrased the question and
asked "Is there anyone who, as a juror, if they found someone else practiced some other type of religion
would use that in determining either their guilt as a factor in their guilt or in [sic] a factor in their punishment." 
One panel member responded that his judgment would be affected if they were talking about that
"vampirism and satan stuff" because he believed that "people who do practice that are out to harm people." 
This question and response led to another objection by the prosecutor. Defense counsel then sought to
continue this line of questioning without mentioning specific kinds of religion, but the trial court said he
would "deny the right to go into that because you've already brought up the satanism and . . . [v]ampires."

 Appellant contends that denying his counsel the opportunity to inquire about possible
prejudice against satanism and vampirism denied him the right to question members of the venire panel in
order to intelligently exercise peremptory challenges. 

 The standard of review in a case where the appellant claims that he was improperly
restricted on voir dire is whether the trial court abused its discretion. See Smith v. State, 703 S.W.2d
641, 642-43 (Tex. Crim. App. 1985). A defendant's constitutional right to counsel under Article I, section
10, of the Texas Constitution includes, inherently, the right of his counsel to question the members of the
jury panel in order to intelligently exercise peremptory challenges. Id. at 643. As a general rule, the trial
court should give a defendant great latitude in questioning the jury panel. However, the trial court also can,
and should, control the scope of voir dire by exercising his sound discretion to limit improper questioning. 
Id. In order to show an abuse of discretion, a defendant must demonstrate that the question he sought to
ask was proper. Caldwell v. State, 818 S.W.2d 790, 793-94 (Tex. Crim. App. 1991), cert. denied,
503 U.S. 990 (1992). If the question was proper and the defendant was prevented from asking it, then
harm is presumed because the defendant could not intelligently exercise his peremptory challenges without
the information gained from an answer. Smith v. State, 703 S.W.2d at 643. A question is proper if its
purpose is to discover a juror's views on an issue applicable to the case. Smith v. State, 513 S.W.2d
823, 826 (Tex. Crim. App. 1974). However, the trial court may restrict questions which attempt to
commit a venire member to a particular resolution based upon facts peculiar to the trial. Coleman v. State,
881 S.W.2d 344, 350-51 (Tex. Crim. App. 1994), cert. denied, 513 U.S. 1096 (1995). A question that
constitutes a "global fishing expedition" is not proper. Caldwell v. State, 818 S.W.2d at 794.

 Appellant has not shown how the questions he wanted to pursue properly related to an
issue in the case. Appellant began the line of questioning with the statement that there may be some
evidence in the case concerning vampires or satanism, then asked whether the panelists would be
prejudiced against someone practicing a different religion. There was no testimony suggesting that the
offenses committed had anything to do with protected religious beliefs. The offenses were not committed
in connection with religious ceremonies. There was minimal evidence about these subjects. As to
vampirism, Pedro Jimenez testified that appellant was the leader of some kind of vampire group in which
persons dressed in black and drank each other's blood. An ambulance attendant described appellant Lisa
Badger as wearing white Halloween makeup with dark circles in her face. An officer testified that appellant
Alexander gave the false name "Alex Lestat" when asked to identify himself. The officer was suspicious
because she associated this name with a series of novels about vampires. Appellant contends that there was
testimony about blood in various places at the scene of the crime, but does not refer to any specific
evidence in the record that the blood in the apartment had come from anyone other that the victim, or that
the blood had been placed there during some religious activity. The only reference in the record to possible
satanism was Pedro Jimenez's testimony that co-defendants Bohle and Sandoval told him that they planned
to "throw a pentagram" underneath the victim. There was no testimony that this plan was carried out or
what the significance of a pentagram might be. Not only did these topics not relate to an issue in the case,
but appellant made no distinction in his questions between belief and practice. The protection of free
exercise of religion in both the Texas and federal constitutions distinguishes between freedom to believe,
which is absolute, and freedom to act, which remains subject to regulation for protection of society. See
Tilton v. Marshall, 925 S.W.2d 672, 677 (Tex. 1996). As the State points out in its brief, the fact that
some people might engage in the practice of pedophelia does not lead to the classification of pedophelia
as a religion. After the State's objection was sustained, appellant attempted to broaden the question posed
and have it only refer to possible prejudice against "some other type of religion" or "different" religious
beliefs. However, since appellant had already raised the issue in terms of vampirism and satanism, even
when the question was posed in more general terms, the venire panel members were still thinking about the
original question, as demonstrated by the response elicited, which was still about vampirism and satanism. 
Finally, appellant's attempt to rephrase the question to refer to "other" or "different" religions made the
question so broad as to be a "global fishing expedition." See Cooper v. State, 959 S.W.2d 682, 684
(Tex. App.--Austin 1997, pet. ref'd). It could have opened the inquiry to what Catholics think of
Protestants, and so forth. Appellant has not directed our attention to any authority that a defendant is
entitled to pose the sort of questions appellant sought to ask here. We have not found any authority that
compels permitting general inquiry regarding potential religious prejudice. We note that the United States
Supreme Court has indicated that there is no general requirement under the federal constitution that an
accused be allowed to pose voir dire questions about a specific prejudice feared by him, whether it is in
respect to race, ethnic origin, national origin, or religion. See Ristaino v. Ross, 424 U.S. 589, 596-98
(1976). We overrule appellant's points of error two and three. 

 Appellant contends in points of error four, five and six that the trial court abused its
discretion by denying appellant additional time for voir dire. After appellants' attorneys had exhausted their
time for questioning the panel, they requested more time. One request was for "some additional time so
I can discuss the educational background of the jurors that were vacillating on the innocence, not guilty
issue . . . as to the placing a burden on the defendant when they said the person would have to be innocent
in order to be found not guilty." The other request was for more time "to get into people's background and
any type of counseling, whether it's drug or alcohol or as a social worker. I think there will be testimony
from social workers and drug and/or alcohol counselors and I think people's prior experience may affect
their judgment in this case, either lowering the burden of proof or affect their judgment on purposes of
punishment." The trial court denied these requests and began hearing challenges for cause.

 There are competing rights in the conduct of voir dire. The first is the defendant's
constitutionally guaranteed right to counsel, which encompasses the right to question prospective jurors in
order to intelligently and effectively exercise peremptory challenges and challenges for cause. The second
is the trial judge's interest in imposing reasonable restrictions on the exercise of voir dire examination. 
McCarter v. State, 837 S.W.2d 117, 119-20 (Tex. Crim. App. 1992). These two rights "coexist and
must be harmonized." Id., quoting Ratliff v. State, 690 S.W.2d 597, 599 (Tex. Crim. App. 1985). Trial
courts should allow defendants much leeway in questioning a jury panel during voir dire, but at the same
time, trial courts must be afforded the ability to control the voir dire process if sound discretion would
compel a trial judge to restrict the questioning in the interest of conducting an orderly and expeditious trial. 
See Ex parte McKay, 819 S.W.2d 478, 482 (Tex. Crim. App. 1990); Harkey v. State, 785 S.W.2d
876, 878 (Tex. App.--Austin 1990, no pet.)

 The control of voir dire rests largely within the discretion of the trial court. Boyd v. State,
811 S.W.2d 105, 115 (Tex. Crim. App. 1991). The standard by which to review a restriction of voir dire
is abuse of discretion. Id.; Smith v. State, 703 S.W.2d at 643. In Ratliff v. State, 690 S.W.2d at 599-600, the court of criminal appeals established a three-part test for use in considering whether a trial court
abused its discretion in imposing time limits on voir dire. In order to establish abuse of discretion, an
appellant must demonstrate (1) that he did not attempt to prolong the voir dire; (2) that he was not
permitted to ask proper and relevant voir dire questions because of the time limitations; and (3) as to
questions directed toward individual jurors, that he was not permitted to examine jurors who actually served
on the jury. 

 The State contends that appellant unnecessarily prolonged the voir dire and did not
efficiently utilize the time given. The State points out that the first defense attorney to address the panel
spent his entire ten minutes talking about matters of little importance and asked no questions of the panel,
thus wasting valuable voir dire time. We agree that this fact weighs against appellant in the first factor in
this analysis. Counsel has a duty, within reasonable bounds, to budget his time. Barrett v. State, 516
S.W.2d 181, 182 (Tex. Crim. App. 1974), cert. denied, 420 U.S. 938 (1975). "It is not only the right
but the duty of the trial court to confine the examination of prospective jurors within reasonable limits. If
this was not so, some trials would never terminate." Grizzell v. State, 298 S.W.2d 816, 822 (Tex. Crim.
App. 1956) (opinion on motion for rehearing). 

 The most important element in the test seems to be the determination of whether appellant
sought to ask a proper question. The focus is whether the appellant proffered a proper question concerning
a proper area of inquiry. Caldwell v. State, 818 S.W.2d at 793. A question that is so broad in nature as
to constitute a "global fishing expedition" is not proper. Smith v. State, 703 S.W.2d at 645. There must
be a specific question presented to the trial court. Merely describing a general subject matter on which
appellant wanted to question the venire is not sufficient to preserve a question for review. It only introduces
a new topic for discussion. See Caldwell v. State, 818 S.W.2d at 794. The questions appellant wanted
more time to ask were simply too vague and general. This Court has difficulty trying to determine precisely
what appellant wanted to ask. One subject appellant wanted to explore was the educational background
of some panel members who had trouble understanding the State's burden of proof. Appellant has not
specified the panel members he intended to question. While a venireperson's educational background
might be of some interest to counsel, the relevance of this inquiry to the issues in this case is not apparent. 
Unlike a paper-intensive fraud case, for example, this case was not exceptionally complex and did not
require higher-order thinking skills indicated by a higher education. The other subject, about panel
members knowledge of social workers or counselors, is too vague and uncertain. It is not clear whether
defense counsel wanted to know if any of the panel did that sort of work, had used the services of such
professionals, or just knew someone who worked in those areas. While this type of information might be
of some interest to a person selecting a jury, none of it seems critical to the issues in this case. It is
understandable that the trial court denied more time for questioning on such vague subject areas. The
questions were not sufficiently focused to require an extension of time. Appellant has not shown that the
court's limitation of time was an abuse of discretion. 

 Finally, the third part of the test is that appellant must show that he was not permitted to
examine prospective jurors who actually served. Appellant does not point to anything in the record to show
that any of the unspecified panel members he wanted to ask about their educational background actually
served on the jury. Appellant does not call our attention to anything in the record which would show that
he was harmed by the trial court's denial of these questions. Points of error four, five and six are overruled.


Prosecutor's Argument

 Appellant's seventh point of error contends that the trial court erred by overruling his
objection to the prosecutor's closing argument at the guilt-innocence stage of the trial. Appellant's
objection was that the prosecutor was giving his personal opinion and that this was argument going outside
the record. The trial court overruled the objection on the ground that the prosecutor was answering the
defense's argument. Defense counsel argued in closing as follows:


So, let me start by telling you that I submit to you that with all due respect to my good
friends from the State, they are not sure who did what, when or why. They are not sure
who forced who to do what or when or why. And consequently, neither do you. 



The prosecutor began his argument with this response:


I'm going to talk to you, first of all, about the attacks on Cheryl Branch [State's witness]
and the allegations that were made that we weren't sure about what we brought to you and
we weren't sure about this and we weren't sure about that.


 But folks, we've been sure from the get-go. We are absolutely sure about what
we brought to you folks. . . . [objection and ruling] We are absolutely sure that these six
people before you and the seven others that are here only in pictures, abducted Rudy-- 



 Proper jury argument must fall within one of four general areas: (1) summation of the
evidence; (2) reasonable deductions from the evidence; (3) responses to opposing counsel's argument; and
(4) pleas for law enforcement. Coble v. State, 871 S.W.2d 192, 204 (Tex. Crim. App. 1993), cert.
denied, 115 S. Ct. 101 (1994); Alejandro v. State, 439 S.W.2d 230, 231 (Tex. Crim. App. 1973). 
Arguments which exceed these areas are erroneous. Felder v. State, 848 S.W.2d 85, 95 (Tex Crim.
App. 1992). It is well settled that a prosecutor cannot inject his personal opinion of guilt into his argument. 
See Fowler v. State, 500 S.W.2d 643 (Tex. Crim. App. 1973); Baldwin v. State, 499 S.W.2d 7 (Tex.
Crim. App. 1973). It is equally well settled that the prosecutor may argue his opinions concerning issues
in the case as long as the opinions are based on the evidence in the record and do not constitute unsworn
testimony. McKay v. State, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985). The underlying prohibition
against a prosecutor's giving his personal opinion about a case is actually against his giving an opinion based
on special expertise, such as experience with many criminal cases. Johnson v. State, 698 S.W.2d 154,
167 (Tex. Crim. App. 1985). Another reason for the prohibition is to prevent him from implying to the jury
that he knows of other incriminating evidence that has not been produced at the trial. Wyatt v. State, 566
S.W.2d 597, 604 (Tex. Crim. App. 1978).

 The category of permissible argument having to do with responding to an opposing
counsel's argument is sometimes referred to as the invited argument rule. This rule permits the prosecutor
to argue outside the record in response to defense argument which goes outside the record. Wilson v.
State, 938 S.W.2d 57, 60 (Tex. Crim. App. 1996), citing Johnson v. State, 611 S.W.2d 649, 650 (Tex.
Crim. App. 1981). It is well settled that a prosecutor may answer jury argument by opposing counsel so
long as the response does not exceed the scope of the invitation. Andujo v. State, 755 S.W.2d 138, 144
(Tex. Crim. App. 1988); Johnson, 611 S.W.2d at 650. We find the prosecutor's statements of
confidence and certainty in his case were permissible argument because the appellant opened the door by
challenging the adequacy of the State's knowledge, presentation and evidence. The prosecutor's reference
to being "absolutely sure about what we brought to you folks" is clearly a reference to the evidence in the
case and thus is appropriate argument within the categories of summation of the evidence and reasonable
deductions from the evidence. To the extent that the argument can be interpreted as injecting the
prosecutor's personal opinion, there is no implication that the prosecutor was asking the jury to rely on his
expertise or his special access to information not introduced into evidence. Point of error number seven
is overruled. 


Accomplice Witness

 Appellant's eighth and ninth points of error argue that the trial court erred by not instructing
the jury in the charge on guilt-innocence that Pedro Jimenez was an accomplice witness whose testimony
required corroboration. Appellant argues that Jimenez was an accomplice as a matter of law, or
alternatively, that the trial court should have at least submitted the issue to the jury to determine whether
Jimenez was an accomplice in fact. A statute requires corroboration of accomplice testimony:


 A conviction cannot be had upon the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the offense
committed; and the corroboration is not sufficient if it merely shows the commission of the
offense.



Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979).


 The Court of Criminal Appeals has defined an accomplice witness as follows:



An accomplice witness is one who has participated with someone else before, during or
after the commission of a crime. If the witness cannot be prosecuted for the offense with
which the accused is charged, then the witness is not an accomplice witness as a matter of
law. Moreover, a witness is not an accomplice merely because he or she knew of the
offense and did not disclose it, or even concealed it.



Kunkle v. State, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986), cert. denied, 492 U.S. 937 (1989) 
(citations omitted). Since the significant changes made in the law of complicity by the provisions of the
1974 Penal Code, an accessory after the fact is no longer recognized in Texas as a party to the crime with
which the perpetrator is charged and cannot be convicted of such crime. Accessorial conduct is dealt with
as a separate offense, hindering apprehension or prosecution. See Tex. Penal Code Ann. § 38.05 (West
Supp. 1998). Thus, a trial court does not err by refusing to instruct the jury that the testimony of one who
would have been an accessory after the fact under the pre-1974 penal codes is required to be
corroborated, as he is not an accomplice witness. See Easter v. State, 536 S.W.2d 223, 226-29 (Tex.
Crim. App. 1976); Navarro v. State, 863 S.W.2d 191, 201-02 (Tex. App.--Austin 1993), pet. ref'd,
891 S.W.2d 648 (Tex. Crim. App. 1995). 

 Appellant contends that Jimenez was involved in the offense to such an extent that he was
an accomplice. He argues that Jimenez was closely connected to the group and aware of what they were
doing, and that he helped to hide or destroy evidence after the offense. Jimenez testified that he was
appellant's "right-hand man." Appellant contends that Jimenez was present when appellant struck
Meinecke and sent him out on the streets to earn money. Appellant asserts that this occurred in the
apartment in which Meinecke was held. The record does not show where the three men were when
Jimenez observed this event. We can find nothing in the record that suggests Jimenez was in the apartment
at the same time Meinecke and appellant were there. Jimenez testified that appellant told him he was going
to get Alexander to find and hold Meinecke for appellant. Appellant points to Jimenez's testimony that he
talked to Sandoval and Bohle and they told him they intended to make charms out of Meinecke's body
parts. Jimenez testified that he called appellant to ask him what was happening, and appellant "said that
they had Rudy tied up and that they were beating him." Jimenez testified that several days after the offense
was committed, a number of the people who had been present at the time of the offense came and talked
to Jimenez and told him they were upset because they were supposed to get cleaning supplies from
appellant to clean up the apartment but he had not provided them. Jimenez took one of the participants
to a store and bought cleaning supplies and delivered them to the apartment, and also used his truck to haul
away a mattress that had a stain on it. Alexander told him that the stain was blood. 

 Before and during the kidnaping, Jimenez merely had knowledge of some parts of the
crime. There is no evidence that he committed an affirmative act before or during the offense to aid in its
commission. There is no evidence that he was present while Meinecke was kidnaped or terrorized, or
participated in planning, promoting or directing that the offense be committed. Appellant contends
Jimenez's assistance in cleaning the apartment after the offense renders him an accomplice. However, a
person is not an accomplice witness just because he knew of the crime and failed to disclose it, or even
assisted in concealing it. Kunkle, 771 S.W.2d at 439. The trial court did not err in refusing to charge the
jury that Jimenez's testimony had to be corroborated, or in refusing to submit the issue of whether he was
an accomplice as a matter of fact. Points of error eight and nine are overruled.

Sufficiency of Evidence

 Appellant's twelfth point of error is related to the eighth and ninth. He claims that if Jimenez
is found to be an accomplice whose testimony must be corroborated, there is no corroboration and the
evidence is insufficient to convict him of the kidnaping on December 19, 1994. Our determination that
Jimenez was not an accomplice requiring corroboration renders this point moot. In the alternative,
appellant argues that even if Jimenez is not found to be an accomplice, the evidence is still insufficient to
support the conviction. The critical issue on review of the legal sufficiency of the evidence is whether the
record evidence could reasonably support a finding of guilt beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307, 318-19 (1979); Joseph v. State, 897 S.W.2d 374, 376 (Tex. Crim. App. 1995). 
The question is not whether we believe the evidence at trial established guilt beyond a reasonable doubt,
but whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of
fact could have found the essential elements of the crime beyond a reasonable doubt. The application
paragraph of the court's charge in pertinent part asked the jury whether appellant, acting together as a party
with Lisa Badger, Darrold Alexander, Timothy Lathrop, Jarriatt Bohle, and Jeremiah Sandoval or any of
them, intentionally or knowingly abducted Rudy Meinecke without his consent, with intent to prevent his
liberation by secreting or holding him in a place where he was not likely to be found and with intent to
terrorize him.

 Pedro Jimenez testified that he talked to appellant on the night of December 16, l994, that
appellant was very angry because Rudy Meinecke had "snitched" on him and he was going to get Darrold
Alexander to find Meinecke and hold him. When Jimenez spoke to appellant again on December 19,
appellant told Jimenez that Meinecke was tied up and was being beaten. Jimenez's testimony shows that
Alexander and the other defendants kidnaped Meinecke at appellant's command. The attackers' repeated
questions to Meinecke about why he had reported appellant to the police suggest that they were carrying
out appellant's orders. Although there is no evidence appellant was present in the apartment during the
beating on the nineteenth and twentieth, he had initiated the kidnaping by his command, he had set the
example for the type of torture to be carried out by his conduct during the earlier abduction, and he was
kept informed of the ongoing activity, as is clear from his comments to Jimenez that Meinecke was being
beaten. There was evidence that Alexander directed that appellant be telephoned in order to obtain his
direction on what should be finally done with the victim. Appellant was clearly the leader of the group and
in control of their activity. The evidence was sufficient to support appellant's conviction as a party to the
kidnaping on December 19-20. Appellant's twelfth point of error is overruled. 


Severance

 Appellant's tenth point of error contends that the trial court erred by refusing to grant a
motion to sever his prosecution from that of the other five defendants. The code of criminal procedure
provides in reference to severance:


 Two or more defendants who are jointly or separately indicted or complained
against for the same offense or any offense growing out of the same transaction may be,
in the discretion of the court, tried jointly or separately as to one or more defendants;
provided that in any event either defendant may testify for the other or on behalf of the
state; and provided further, that in cases in which, upon timely motion to sever, and
evidence introduced thereon, it is made known to the court that there is a previous
admissible conviction against one defendant or that a joint trial would be prejudicial to any
defendant, the court shall order a severance as to the defendant whose joint trial would
prejudice the other defendant or defendants. 



Tex. Code Crim. Proc. Ann. art. 36.09 (West 1981). 

 In the absence of a showing that a co-defendant has an admissible prior conviction while
the person seeking severance does not, the granting of a motion for severance rests in the sound discretion
of the trial court. Younger v. State, 457 S.W.2d 67, 71 (Tex. Crim. App. 1970). Appellant did not
present any evidence that any of the co-defendants had an admissible prior conviction or present any other
evidence showing why a joint trial would be prejudicial. A defendant does not properly preserve error
unless he offers evidence in support of his motion to sever. See Ransonnette v. State, 550 S.W.2d 36,
41 (Tex. Crim. App. 1976). Appellant's motion to sever is not supported by anything other than the
unsworn general assertions by Timothy Lathrop's attorney that his client would be prejudiced by a joint
trial. Generally, unsworn assertions of fact by an attorney are not regarded as evidence. See Loveless v.
State, 800 S.W.2d 940, 945 (Tex. App.--Texarkana 1990, pet. ref'd).

 In a case in which the trial court permitted the defendant to adopt the motion for severance
of a co-defendant, the reviewing court indicated that in order for the particular defendant to preserve error
it was still necessary to present evidence supporting his position that a joint trial would be prejudicial as to
him. See Hudson v. State, 794 S.W.2d 883, 885 (Tex. App.--Tyler 1990, no pet.). This Court recently
held that a trial court had not abused its discretion in overruling a motion for severance where the defendant
did not offer evidence in support of his motion, and merely alleged in his motion that he could not get a fair
trial if tried with a coconspirator. We said that where the defenses appeared to be consistent with each
other and the requesting defendant presented no evidence to the contrary, there was no abuse of discretion
in holding a joint trial. Carlson v. State, 940 S.W.2d 776, 780-81 (Tex. App.--Austin 1997, pet. ref'd). 
The mere allegation that prejudice will result is not evidence of, or a sufficient showing of, prejudice under
article 36.09, particularly when the severance is discretionary with the trial judge. Mulder v. State, 707
S.W.2d 908, 915 (Tex. Crim. App. 1986). An accused must apprise the trial court of exactly what the
inconsistent defenses will be, or what other reason for prejudice exists. Proof that would demonstrate
differing degrees of culpability among the defendants is not enough to warrant separate trials. Instead, the
co-defendants' positions must be "mutually exclusive" in the sense that the jury, in order to believe the core
of one defense, must necessarily disbelieve the core of the other. See Silva v. State, 933 S.W.2d 715,
719 (Tex. App.--San Antonio 1996, no pet.).

 Appellant's motion to sever is not supported by any evidence, and is not sufficient to
preserve error. Even if the adopted unsworn allegations of a co-defendant's counsel were considered
evidence and error had been preserved, the allegations are so general and evidence so lacking that they
do not establish a sufficiently specific instance of conflicting defenses or other circumstances that would
make a joint trial prejudicial. Appellant has not shown that the trial court's refusal of the motion was an
abuse of discretion. Appellant's tenth point of error is overruled.


Voluntary Release In Safe Place

 In his eleventh point of error, appellant argues that the trial court erred during the
punishment phase of the trial by refusing to give the jury a requested charge on whether appellant and his
co-defendants voluntarily released the victim in a safe place. Aggravated kidnaping is a first degree felony
unless the defendant raises this issue at the punishment stage and proves it in the affirmative by a
preponderance of the evidence, in which case the offense is a felony of the second degree. Tex. Penal
Code Ann. § 20.04(d) (West Supp. 1998). (2) 

 This provision has been described as similar to an affirmative defense. See Spakes v.
State, 913 S.W.2d 597, 599 n.1 (Tex. Crim. App. 1996) (Keller, J., dissenting). The issue whether an
accused voluntarily released his victim alive in a safe place is not submitted to the jury unless the record
contains evidence that would support such a finding. Oestrick v. State, 939 S.W.2d 232, 238-39 (Tex.
App.--Austin 1997, pet. ref'd). The threshold burden of production on the issue of voluntary release in
a safe place is on the defendant. See Williams v. State, 851 S.W.2d 282, 286 (Tex. Crim. App. 1993). 
If evidence from any source raises the issue then the burden of production is met and the issue must be
submitted to the fact-finder. Id. Although the issue is to be raised and submitted at the punishment stage
of the trial, evidence raising the issue is likely to come out in the State's presentation of the circumstances
of the offense at the guilt-innocence stage of the trial, and there is no requirement that evidence admitted
at the guilt-innocence stage must be reintroduced in order to be considered at punishment on the voluntary
release issue. Buchanan v. State, 911 S.W.2d 11, 13-14 (Tex. Crim. App. 1995). It is well settled that
as a general rule an accused has the right to an instruction on any defensive issue raised by the evidence,
whether such evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial
court may or may not think about the credibility of this evidence. Miller v. State, 815 S.W.2d 582, 585
(Tex. Crim. App. 1991). When the evidence fails, however, to raise a defensive issue, there is no error
if the trial court refuses to give a requested instruction. Muniz v. State, 851 S.W.2d 238, 254-55 (Tex.
Crim. App. 1993). Thus, we must consider all of the evidence presented during the trial and at punishment
to determine whether the issue was raised. 

 We find no evidence that the co-defendants voluntarily released their victim in a safe place. 
In the early morning hours of December 21, 1994, Meinecke, who was unconscious, was dressed in a shirt
and sweat pants and carried out of the apartment by a group including Alexander, Lisa Badger, Timothy
Lathrop, and others. Meinecke was not able to sit up in a chair or to stand. Alexander and Badger had
discussed what to do with the victim. They planned to take him to a waterfall in the Galleria area and dump
his body there. Lisa Badger suggested that he be injected with lighter fluid and bleach. She thought this
would put him into shock and prevent his body from floating. Alexander carried hypodermic syringes filled
with lighter fluid when he left with the group. While the group was carrying Meinecke through a residential
area on the way to the waterfall, a deputy constable on patrol saw them, turned around and drove back
to find out why they were out at 3:00 a.m. Upon seeing the patrol car, Timothy Lathrop dropped
Meinecke and the group covered his body with a pile of clothing. Lisa Badger and Alexander told the
deputy that a friend had been seen drunk and passed out on the street and that they were walking him
home. When the deputy asked to see this friend, the co-defendants pointed toward the pile of clothes. 
The deputy could not tell by looking at the bundle that there was a person under it. When the deputy
uncovered Meinecke, it was clear that he had been severely injured and needed medical assistance. 
Meinecke was unconscious and did not regain consciousness at the scene. The deputy called for an
ambulance and additional law enforcement assistance. He testified that what he was being told did not
make sense. He knew that the victim had to have been carried by those in the group to where he was
found, but their direction of travel did not correspond to where they said they were heading to take him
home. He also thought it suspicious that no one in the group had noticed that their friend was injured. The
deputy said that he would have expected them to be seeking medical assistance for the victim, rather than
taking him home. Appellant points to the fact that the group was walking away from the victim who had
been placed on the ground in a well-lit residential area patrolled by law enforcement officers; he contends
that this supports the inference that Meinecke was being voluntarily released in a safe place. We disagree. 

 There is no evidence that the group's release of Meinecke was voluntary. In this case, as
we said in Oestrick, "Using the ordinary meaning of the term, appellant's actions were not voluntary;
rather, they were induced by the police. . . . [T]he evidence shows that appellant's motivation in leaving
[the victim] in his truck was his own escape and not her safety." Oestrick, 939 S.W.2d at 239. We
concluded in that case that the defendant was not entitled to an instruction on voluntary release. Id. In the
instant case, the co-defendants dropped and hid their unconscious victim when they saw a law enforcement
officer and lied to him about what they were doing, where they were going, and feigned ignorance of the
victim's condition. None of the evidence suggests that anyone in the group made a conscious decision to
change the initial plan of carrying the victim to a waterfall, injecting him with lighter fluid and throwing the
body into the water. The events by which the victim was saved from this plan were the result of law
enforcement intervention. See Rodriguez v. State, 746 S.W.2d 927, 929 (Tex. App.--Houston [1st
Dist.]), remanded on other grounds, 753 S.W.2d 161 (Tex. Crim. App. 1988).

 To avail himself of the mitigating effects of the voluntary release provision, an accused "must
have performed some overt and affirmative act that brings home to the victim that he/she has been fully
released from captivity." Wiley v. State, 820 S.W.2d 401, 411 (Tex. App.--Beaumont 1991, no pet.). 
No such affirmative act was performed in this case. There was no evidence of a voluntary release of the
victim. 

 The victim in the instant case did finally get law enforcement protection and medical
attention. Perhaps it can be said that the victim got to a safe place, but there is no evidence that this
resulted from the voluntary decision of any member of the group before the fortuitous intervention of the
deputy constable. There is no evidence that the victim was intentionally placed where he was found as a
means of releasing him from his involuntary captivity. At best, the circumstances show a victim who was
unconscious and in need of medical attention being placed under a pile of clothes on a residential street in
Houston at three o'clock on a December morning arousing the suspicion of a law enforcement officer. This
might have been safer for the victim than being beaten, tortured, and set afire; it might have been safer than
being tossed into a waterfall to drown or die of toxic injections, but there is no evidence that any of the
parties intended to place the victim where the law enforcement officer found him as a means of releasing
him in a safe place. No instruction was necessary under these facts. Appellant's eleventh point of error
is overruled. 

 Having overruled appellant's twelve points of error, we affirm the trial court's judgments
in both convictions.



 

 J. Woodfin Jones, Justice

Before Chief Justice Carroll, Justices Jones and Kidd; Chief Justice Carroll not participating

Affirmed on Both Causes

Filed: August 13, 1998

Do Not Publish
1. Amendments to this section after the commission of the offenses are irrelevant to the appeal. The
current version is cited for convenience. 
2. This statute was changed to place the burden of proof on the issue of safe release on a defendant. 
The effective date of the change was September 1, 1994, and the date of the offenses here was December
1994. See Penal Code, 3d Leg., R.S., ch. 900, sec. 1.01, § 20.04(c), since renumbered as § 20.04(d). 
We cite the current code for convenience. 



sness at the scene. The deputy called for an
ambulance and additional law enforcement assistance. He testified that what he was being told did not
make sense. He knew that the victim had to have been carried by those in the group to where he was
found, but their direction of travel did not correspond to where they said they were heading to take him
home. He also thought it suspicious that no one in the group had noticed that their friend was injured. The
deputy said that he would have expected them to be seeking medical assistance for the victim, rather than
taking him home. Appellant points to the fact that the group was walking away from the victim who had
been placed on the ground in a well-lit residential area patrolled by law enforcement officers; he contends
that this supports the inference that Meinecke was being voluntarily released in a safe place. We disagree. 

 There is no evidence that the group's release of Meinecke was voluntary. In this case, as
we said in Oestrick, "Using the ordinary meaning of the term, appellant's actions were not voluntary;
rather, they were induced by the police. . . . [T]he evidence shows that appellant's motivation in leaving
[the victim] in his truck was his own escape and not her safety." Oestrick, 939 S.W.2d at 239. We
concluded in that case that the defendant was not entitled to an instruction on voluntary release. Id. In the
instant case, the co-defendants dropped and hid their unconscious victim when they saw a law enforcement
officer and lied to him about what they were doing, where they were going, and feigned ignorance of the
victim's condition. None of the evidence suggests that anyone in the group made a conscious decision to
change the initial plan of carrying the victim to a waterfall, injecting him with lighter fluid and throwing the
body into the water. The events by which the victim was saved from this plan were the result of law
enforcement intervention. See Rodriguez v. State, 746 S.W.2d 927, 929 (Tex. App.--Houston [1st
Dist.]), remanded on other grounds, 753 S.W.2d 161 (Tex. Crim. App. 1988).

 To avail himself of the mitigating effects of the voluntary release provision, an accused "must
have performed some overt and affirmative act that brings home to the victim that he/she has been fully
released from captivity." Wiley v. State, 820 S.W.2d 401, 411 (Tex. App.--Beaumont 1991, no pet.). 
No such affirmative act was performed in this case. There was no evidence of a voluntary release of the
victim. 

 The victim in the instant case did finally get law enforcement protection and medical
attention. Perhaps it can be said that the victim got to a safe place, but there is no evidence that this
resulted from the voluntary decision of any member of the group before the fortuitous intervention of the
deputy constable. There is no evidence that the victim was intentionally placed where he was found as a
means of releasing him from his involuntary captivity. At best, the circumstances show a victim who was
unconscious and in need of medical attention being placed under a pile of clothes on a residential street in
Houston at three o'clock on a December morning arousing the suspicion of a law enforcement officer. This
might have been safer for the victim than being beaten, tortured, and set afire; it might have been safer than
being tossed into a waterfall to drown or die of toxic injections, but there is no evidence that any of the
parties intended to place the victim where the law enforcement officer found him as a means of releasing
him in a safe place. No instruction was necessary under these facts. Appellant's eleventh point of error
is overruled. 

 Having overruled appellant's twelve points of error, we affirm the trial court's judgments
in both convictions.